IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JUDSON WILSON,                    )
                                  )
        Plaintiff,                )
v.                                )    CASE NO. 2:09-cv-21-MEF
                                  )
BILLY GENE DOSS, *et al.,*        )    (WO – Do Not Publish)
                                  )
        Defendants.               )

# MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Summary Judgment (Doc. #115) filed by Defendants City of Montgomery (the "City"), Art Baylor ("Baylor"), Terry Reid ("Reid"), Jerry McQueen ("McQueen"), William E. Herman ("Herman"), and John Carnell ("Carnell") (collectively, the "City Defendants"), which has been fully briefed and is now ripe for disposition.

Upon consideration of the parties' briefs and the record as a whole, the Court finds that the City Defendants' Motion for Summary Judgment is due to be and hereby is GRANTED.

## I. INTRODUCTION

This case involves various state and federal claims arising from the sexual abuse of Plaintiff Judson Wilson ("Plaintiff or "Wilson") by Defendant and former City of Montgomery School Bureau Officer Billy Gene Doss ("Doss"). Plaintiff filed the original

Complaint,[1] consisting of five state law claims and one federal law claim under 42 U.S.C.
§ 1983, in the Circuit Court of Montgomery County, Alabama on December 8, 2008. (Doc.
#1-4.) Defendants removed this case to federal court on January 7, 2009. (Doc. #1.)
Plaintiff moved to remand the state law claims back to the Montgomery County Circuit
Court, and on August 14, 2009, this Court denied Plaintiff's motion. (Doc. #19.) In denying
Plaintiff's motion to remand, the Court found that the removal of both state and federal
claims was appropriate under 28 U.S.C. § 1441(b) because the federal and state causes of
action arose from a single wrong—Doss's improper sexual conduct with Plaintiff (Doc. #19,
at 7) (citing *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 14 (1951); *In re City of Mobile*, 75
F.3d 605, 608 (11th Cir. 1996)). On October 24, 2012, the City Defendants moved for leave
to file a Third-Party Complaint pursuant to Rule 14(a)(1) of the Federal Rules of Civil
Procedure against Linda Holmberg ("Holmberg") and American Behavioral Benefits
Manager, Inc. ("American Behavioral") (Doc. #125). The Court denied that motion on
October 9, 2012 (Doc. #145). This case is currently set for trial on December 10, 2012.

## II. JURISDICTION AND VENUE

Jurisdiction over Plaintiff's claims is proper under 28 U.S.C. §§ 1331 (federal
question), 1343 (civil rights), and 1367 (supplemental jurisdiction over state law claims).
The parties do not contest personal jurisdiction or venue, and the Court finds adequate

---

[1] Margaret Wilson filed the original Complaint as Guardian and Next Friend to Plaintiff,
then a minor child. (*See* Doc. #1-4.) On October 31, 2012, the Court granted the City Defendants'
Motion to Substitute Party (Doc. #127), with Plaintiff Judson Wilson substituted as the proper
party–plaintiff. (Doc. #130.) Plaintiff further amended his Complaint on April 28, 2010, to add
Terry W. Reid and John Carnell as defendants. (Doc. #46.)

allegations in support of both.

## III. Facts

The Court has carefully considered all affidavits and exhibits submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

On or about December 15, 2006, Doss, at the time a City of Montgomery Police Department Officer, sexually abused Wilson, at the time a minor child, while locked in Doss's office at Capitol Heights Junior High School.  Doss has confessed to such conduct, which was committed while Doss worked as a School Bureau Officer for the Montgomery Police Department ("MPD").  (Doss Dep. 128:5–18, Doc. #115-2.)  Doss resigned from his position with the MPD shortly after being confronted about the abuse.

On July 11, 2007, Doss pled guilty to three counts of Attempted Sodomy in the First Degree, four counts of Enticing a Child, and one count of Sexual Abuse in the First Degree. On July 24, 2007, Doss received a sentence of confinement for a period of twenty years in the Alabama Department of Corrections.

At all times relevant to this action, Doss was a School Bureau Officer for the MPD. Doss was supervised in this position by the individual City Defendants, except for Carnell, who served as the City's risk manager.  During the relevant time period, the chain of command from the top down at the MPD consisted of: (1) Chief Art Baylor as Chief of Police, (2) Major Terry Reid as the Juvenile Division Commander, (3) Captain Jerry McQueen as the Assistant Commander of the Juvenile Division, and (4) Sergeant William

Herman as supervisor of the school crossing guards.  Herman occasionally supervised School

Enforcement Bureau officers, including Doss, and was serving as Doss's direct supervisor

at the time Wilson's claims arose.  In the foregoing chain of command, inferior officers are

required to carry out legal orders issued by officers who are superior to them.  (Reid Dep.

23:1–24:9, Doc. #115-10; Herman Dep. 67:10–68:9, Doc. #115-6.)  In addition to following

orders through the chain of command, all MPD personnel were required to follow

departmental rules and regulations.  (Baylor Dep. 45:12–15, Doc. #115-6.)  Exclusive final

authority and discretion over personnel matters was vested in Baylor as the highest officer

in the chain of command.  (*See* MPD Rules § 1.602, Doc. #123-2.)  Reid and McQueen were

authorized to exercise some influence over the process as well.  (*See* MPD Rules § 1.602)

("[i]nvoluntary transfers may be identified and determined necessary by Division

Commanders . . . .").

       In 2005 and 2006, prior to Doss's sexual abuse of Wilson, Doss had submitted three

separate requests to be transferred from the School Enforcement Bureau to other bureaus in

the MPD (Doc. #123-5, at 1–3).  He also made a similar request in 2001 (Reid Dep. 43:5–13,

Doc. #115-10).  In each of these three requests, Doss stated he desired to transfer "to further

[his] skills."  (Doc. #123-5, at 1–3.)  Notably, not all of Doss's requests would have taken

him out of frequent contact with children, as his final request on October 13, 2006, sought

a transfer to the Juvenile Enforcement Bureau.  (Doc. #123-5, at 3.)  None of Doss's transfer

requests was granted.

       On December 28, 2005, Herman went to Capitol Heights Junior High School to

investigate a parent's complaint about Doss. (Herman Dep. 42:18–43:5, Doc. #115-6.)
When Herman met with Doss, Doss expressed that he felt locked up with the students, who
he found to be disobedient and rebellious, and that he would become so angry with them that
he sometimes wanted to hurt them. (Herman Dep. 43:20–44:5, 45:4–45:6, Doc. #115-6.)
When Herman asked Doss what he meant by that, Doss said, "sometimes you just want to
choke them." (Herman Dep. 52:5–52:6, Doc. #115-6.)

Herman then brought Doss to McQueen's office, where they discussed a number of
issues in Doss's personal life. During and immediately after Doss's deployment with the
U.S. Navy to Guantanamo Bay, where he served as a naval police officer, his wife divorced
him, gained custody of their children, and was awarded alimony; his father suffered from
dementia and was going to move in with him; one of his sisters had been murdered; another
sister had committed suicide; and he had financial problems. (Herman Dep. 55:3–56:17,
Doc. #115-6; McQueen Memo., Doc. #115-9.) At one point during the meeting, Doss began
weeping about his personal problems. (McQueen Memo., Doc. #115-9.) They discussed two
incidents when Doss spoke disrespectfully to a parent and a teacher. (*Id.*) Doss further
related that he continued to struggle with anger issues despite having met with his pastor.
(*Id.*) Based on the discussions during this meeting, McQueen recommended to Reid that
Doss be placed on administrative leave and referred to a professional counselor to determine
his fitness for duty, as part of the City's Employee Assistance Program ("EAP"). (*Id.*) Reid
then recommended to Baylor that Doss be referred to the EAP for mandatory counseling and
evaluation. (Reid Dep. 55:4–55:13, Doc. #115-10.) Baylor ordered that Doss be placed on

administrative leave and referred to the EAP. (Baylor Dep. 93:23–94:9, Doc. #115-12.)

The EAP is available to all City employees for counseling. An employee can contact an EAP counselor directly, or a supervisor may refer an employee who is having work-related to an EAP counselor. (Carnell Dep. 10:22–11:19.) The EAP also utilizes a network of psychiatrists. (Carnell Dep. 12:8–13.) When a supervisor refers an employee to the EAP for work-related issues, the EAP evaluates the individual's fitness for duty. (Carnell Dep. 12:16–19.) The EAP process allowed for the Juvenile Division Commanders—Reid and McQueen—to exercise discretion in interpreting the fit-for-duty-evaluations of the EAP providers, as the MPD Rules and Regulations state that: "[i]nvoluntary transfers may be identified and determined necessary by Division Commanders . . . ." (MPD Rules § 1.602.) As Doss's immediate supervisor, Herman was also authorized to summarize and communicate his superiors' concerns to the EAP providers and to use some level of discretion in these communications. (Herman Dep. 108:20–109:1, Doc. #115-7.)

According to an unwritten, but generally understood policy in the MPD, when an officer was referred to mandatory counseling with mental health professionals through the EAP, that employee would not be returned to full duty until the EAP provider (or providers) recommended that the officer was fit for normal duty. (Baylor Dep. 116:7–17, Doc. #115-12; Doss Dep. 105:10–15, Doc. #115-2; Herman Dep. 28:21–29:6, 93:23–94:8, Doc. #115-6; Reid Dep. 71:6–20, Doc. #115-10.) It was common for an officer to see more than one provider in the EAP process. Baylor specifically stated that any officer treated through the EAP "would have to be cleared" as "fit for duty" by an EAP provider before Baylor "would

approve them to go back to work."  (Baylor Dep. 116:12–17, Doc. #115-12.)

On December 29, 2005, Linda Holmberg ("Holmberg"), a Licensed Professional Counselor, began providing counseling to Doss through the EAP.  At the time, Holmberg was a new employee of American Behavioral, a company hired by the City to perform services as part of the EAP.  During their counseling sessions, Doss told Holmberg that he sometimes wanted to hurt the children in his work environment.  (Holmberg Dep. 40:4, Doc. #115-19).  During their first session, Holmberg recommended that Doss see his personal physician to obtain a prescription for an antidepressant.  (Def.'s Ex. 8A, at 14, Doc. #115-22.)

On January 9, 2006, Holmberg faxed a memorandum to Herman, in which she recommended to the MPD that Doss "be put on desk duty away from his regular high stress environment for approximately two to three months" and that he continue his weekly therapy sessions with her.  (Pl.'s Ex. A, Doc. #137-1; Holmberg Dep. 42:22–43:6, Doc. #115-19.)

That same day, Doss obtained a note from his personal physician, Dr. Daniel Banach ("Dr. Banach"), which stated that Doss could return to work on January 16, 2006, but to a desk job that would not involve contact with juvenile students.  (Def.'s Ex. A, at 9, Doc. #123-4.)  On February 6, 2006, Doss was seen by Dr. Banach again.  At this time, Dr. Banach noted that Doss was "feeling better," did "not consider himself to be a threat to the juvenile students," has "been returned to his job," and "is much improved."  (Def.'s Ex. 4, at 8, Doc. #123-4.)  According to the MPD policy, a "fit-for-duty recommendation" could only come from an EAP counselor or psychiatrist providing services to the MPD.  (Herman

Dep. 78:115–17, Doc. #115-6.)  The MPD relies on the recommendations of their EAP providers, rather than the recommendations of personal physicians, because the EAP providers are mental health professionals who are provided with copies of job descriptions for the employees they see.  (Carnell Dep. 132:19–133:10, Doc. #115-17.)

After Herman received Holmberg's recommendation that Doss be placed on desk duty, Herman, at McQueen's instruction, called Holmberg to inform her that his supervisors wanted a second opinion from a psychiatrist on whether light duty or desk duty was necessary for Doss.  (Herman Dep. 108:20–109:10, Doc. #115-7.)  During that phone call, Herman told Holmberg that there were no desk jobs available for Doss and that, absent a fit-for-duty recommendation, Doss would have to be placed on administrative leave with pay until his leave expired, at which time he would be placed on administrative leave without pay.  (Herman Dep. 106:18–108:23, Doc. #115-7.)  Holmberg then referred Doss to Dr. Babtunde Abolade ("Dr. Abolade"), a psychiatrist in the EAP provider network.

On January 11, 2006, Dr. Abolade evaluated Doss's overall psychological health and fitness for duty.  (Doc. #123-3, at 5.)  According to Dr. Abolade's record of the appointment, when Doss was asked about his expressed desire to hurt children at school, he acknowledged making "an off-the-wall remark" about hurting the children but denied any "impulse or intention to hurt anyone."  (Doc. #123-3, at 3.)  On January 12, 2006, Dr. Abolade wrote a letter to McQueen stating, "[i]n my opinion [Doss] is fit to return to normal duty and I recommend a different assignment, if possible, than the one in which he is currently employed."  (Doc. #120-3.)  Later the same day, Holmberg learned of Dr. Abolade's opinion

from his nurse.

On January 12, 2006, at Doss's next counseling session with Holmberg, Doss told Holmberg that he would not be able to work his second job and would have difficulty paying his bills if he were placed on desk duty.  (Def.'s Ex. 8A, at 14, Doc. #115-22.)  As a result, that same day, Holmberg submitted her second recommendation to Reid, which supplanted her first recommendation, and advised that Doss be returned to full duty.  (Pl.'s Ex. B, Doc. #137-2; Holmberg Dep. 60:4–10, Doc. #115-20.)  During her deposition, when asked whether she felt that Herman, McQueen, and Reid were "pressuring" her to get Doss back to work, Holmberg answered "yes."  (Holmberg Dep. 57:10–18, Doc. #115-20.)

After receiving the January 12, 2006 recommendations of Dr. Abolade and Holmberg, McQueen and Carnell met to discuss Doss's fitness for duty.  (Carnell Dep. 172:10–20, Doc. #115-17.)  Carnell expressed to McQueen that he thought Doss should be transferred to a different assignment if he was returned to full duty.  (Carnell Dep. 172:21–173:6.)  McQueen then told Carnell that Baylor wanted him to submit his recommendation on Doss's fitness for duty in writing.  (Carnell Dep. 178:4–10.)  Accordingly, on January 13, 2006, Carnell submitted a memorandum to Baylor and Reid, stating that he concurred with the recommendations of Holmberg and Dr. Abolade issued on January 12, 2006, that Doss be returned to full duty.  (Carnell Memo., Doc. #120-5.)  Carnell failed to mention Dr. Abolade's recommendation that Doss be transferred to a different assignment if possible. (Carnell Memo., Doc. #120-5.)

After approximately two more months of counseling sessions with Doss, Holmberg

ultimately concluded that Doss had made significant progress and was ready to be released from further counseling.  On March 7, 2006, Holmberg wrote to McQueen that she felt "comfortable in dismissing [Doss] due to the progress made."  (Doc. #115-22, at 7.)  On March 21, 2006, in her final letter to McQueen, Holmberg wrote that she had released Doss from further EAP counseling, stating that Doss "spoke realistically about all areas of life and advised he was now off his medication and was able to cope with his life personally and professionally."  (Doc. #115-22, at 8.)

Holmberg testified that Doss never confided to her that he had any inappropriate sexual fantasies or desires involving children, or that he was sexually attracted to children. Holmberg also testified that, to the extent that she felt Doss was keeping something from her, she never thought it had anything to do with him sexually abusing or being sexually attracted to children.  (Holmberg Dep. 63:20–64:15.)  In fact, there is no evidence in the record that Doss ever disclosed to Holmberg, Dr. Banach, Dr. Abolade, or any of the City Defendants that he had sexual fantasies involving children or was otherwise sexually attracted to children.  Indeed, in his deposition, Doss himself claims that, at the time he broke down and told his superiors about wanting to physically hurt the children, he was simply depressed and aggravated and had "no sexual feelings" towards children.  (Doss Dep. 75:17–76:13, Doc. #115-2.)

In late January 2006, Doss resumed his normal duties as a School Enforcement Bureau Officer at Capitol Heights Junior High School.  Approximately eleven months after returning to his full, normal duties as a School Enforcement Buruea Officer at Capitol

Heights Junior High School and approximately nine months after Holmberg released Doss from further EAP counseling, Doss sexually abused Wilson in his office at Capitol Heights Junior High School.

## IV. SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect, or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.* at 322–23.

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her

favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus,

summary judgment requires the nonmoving party to "do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed,

a plaintiff must present evidence demonstrating that he can establish the basic elements of

his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific

supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen.*

*Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's

evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the

evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to

the motion, the court must grant summary judgment if there exists no genuine issue of

material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ.

P. 56(c).

## V. DISCUSSION

### A. State Law Claims

Wilson brings the following state law claims against Baylor, Herman, Reid, Carnell,

and McQueen (referred to, collectively, as the "individual City Defendants"), in their

individual capacities: (1) negligence; (2) wantonness;[2] and (3) negligent infliction of

---

[2]    Along with his claims of negligence and wantonness, Wilson asserts a claim of "willfulness" against the City Defendants. The Court cannot find any authority supporting a conclusion that willfulness constitutes an independent cause of action in Alabama. The Court suspects that Wilson asserted this claim to preemptively rebut the City Defendants' affirmative defense of state-agent immunity, to which willful misconduct is an exception. Thus, the Court will

emotional distress.[3]

Wilson also brings a state law claim against the City under § 11-47-90 of the Alabama Code for its neglect, carelessness, and unskillfulness in allowing Doss, Baylor, Herman, Reid, Carnell, and McQueen to work with minor children and for its failure to remove Doss from his position at the school.  (Amend. Compl. ¶¶ 31–35, Doc. #46.)  Wilson also asserts claims for negligence, wantonness, and willfulness against the City in a separate count (Amend. Compl. ¶ 25), but the Court finds that these claims are redundant of Wilson's § 11-47-90 claim, and thus, will not analyze them separately.

### 1.      *Wilson's Negligent Infliction of Emotional Distress Claim Against the Individual City Defendants*

In Count Four of the Amended Complaint, Wilson alleges that the negligent actions of the individual City Defendants proximately caused him to suffer severe emotional distress.  (Doc. #46, at ¶¶ 29–30.)  While the Court will assume, for the purpose of this opinion, that Wilson has suffered emotional distress as a result of the sexual abuse Doss inflicted upon him, the Court concludes that this claim cannot stand because a claim for negligent infliction of emotional distress is not recognized under Alabama law.  *See, e.g.*, *AALAR, Ltd. v. Francis*, 716 So. 2d 1141, 1144 (Ala. 1998) ("[N]egligently causing

---

not analyze Wilson's claim of willfulness independently, but rather will consider this allegation in its analysis of the individual City Defendants' entitlement to state-agent immunity.  *See infra* Part V.A.2.

[3]     Wilson has also asserted state law claims for (1) assault and battery and (2) intentional infliction of emotional distress against Doss only.  (Amend. Compl. ¶¶ 18–22, 27–28, Doc. #46.)  These claims are not the subject of these summary judgment proceedings and, therefore, will remain pending against Doss.

emotional distress is not an independent tort in Alabama, but, rather, . . . it is part and parcel of the traditional tort of negligence."). Accordingly, the City Defendants' Motion for Summary Judgment on Wilson's claim of negligent infliction of emotional distress is due to be GRANTED.

### 2. Wilson's Claims of Negligence and Wantonness Against the Individual City Defendants

In support of his negligence and wantonness claims, Wilson alleges that each defendant: (1) wrongfully hired Doss to work with minor children; (2) wrongfully trained Doss on how to conduct himself around minor children; (3) wrongfully supervised Doss in his interactions with children; (4) failed to remove Doss from the school after learning that he could be dangerous to children; and (5) decided to keep Doss in the school after evaluating the potential liability to the City of Montgomery and the risks to the children—essentially the same allegation as (4) above.

In response to Wilson's negligence and wantonness claims, the City Defendants assert that the police officers—Baylor, Reid, McQueen, and Herman—are entitled to state-agent immunity under the test articulated in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), and Alabama Code § 6-5-338 (1975). Although the City Defendants do not argue in their summary judgment briefs that Carnell, as risk manager for the City, is also entitled to state-agent immunity along with the police officers, they did assert state-agent immunity for Carnell as an affirmative defense in their Answer to the Amended Complaint. (Doc. #51, at 8.) Therefore, the Court will analyze the merits of the state-agent affirmative defense as

applied to Carnell as well.

### a. State-Agent Immunity—Applicable Law

In *Cranman*, the Supreme Court of Alabama restated the test for determining whether a state-agent is entitled to immunity for his or her actions. 792 So. 2d at 405.[4] This test was adopted by a majority of the Alabama Supreme Court in *Ex Parte Butts*. 775 So. 2d 173, 177 (Ala. 2000). The *Cranman* test for state-agent immunity provides:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> > (a) making administrative adjudications;
> > (b) allocating resources;
> > (c) negotiating contracts;
> > (d) hiring, firing, transferring, assigning, or supervising personnel; or

---

[4] Before *Cranman*, the immunity afforded an Alabama peace officer was governed by Alabama Code § 6-5-338(a), which provides:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state . . . and whose duties . . . include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

*Id.* However, in *Hollis v. City of Brighton (I)*, the Alabama Supreme Court held that "whether a qualified peace officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex Parte Cranman* . . . ." 885 So. 2d 135, 143 (Ala. 2004).

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons;

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall* not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Id.*

The Alabama Supreme Court later modified the fourth prong of the *Cranman* test to include the immunity provided to peace officers in § 6-5-338(a) of the Alabama Code. *See Hollis v. City of Brighton (II)*, 950 So. 2d 300, 309 (Ala. 2006). After *Hollis*, the fourth prong of the *Cranman* test provides that a state agent "shall be immune from civil liability" when the claim is based upon the agent's "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or serving as peace officers under circumstances entitling

such officers to immunity pursuant to § 6-5-338(a), *Ala. Code* 1975." *Id.*  Thus, peace officers exercising a discretionary function in the line and scope of their employment are now entitled to state-agent immunity under the *Cranman* test.  *See* Ala. Code § 6-5-338(a).

The Alabama Supreme Court has applied a "burden-shifting" analysis when a party raises the defense of state-agent immunity.  *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003).  In order to establish entitlement to state-agent immunity, state agents have the burden of demonstrating that the plaintiff's claims arise from the performance of a discretionary function that entitles them to immunity.  *Id.*; *see also Ex parte Wood*, 852 So. 2d 705, 709 (Ala. 2002) ("In order to claim the benefits of [State] immunity, a State officer or employee bears the burden of showing that the plaintiff's claims arise from the officer or employee's performance of a discretionary duty on behalf of the State." (quoting *Ex parte Davis*, 721 So. 2d 685, 689 (Ala. 1998) (internal quotation marks omitted))).

If a state agent meets this burden, the burden then shifts to the plaintiff who must establish that the state agent either (1) violated a statute, rule, or the state or federal Constitutions, or (2) acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority, or under a mistaken interpretation of the law.  *See Giambrone*, 874 So. 2d at 1052.  A state agent acts beyond his or her authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."  *Id.*; *see also Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002) (holding that passages in a school board's policy manual, which imposed a general responsibility on teachers to ensure student safety and to report hazards that they could not

correct to the school's vocational director, were not the kind of detailed rules and regulations contemplated by the second state-agent immunity exception).

### b.     State-Agent Immunity—Application

The City Defendants argue that the four police officers—Baylor, Reid, McQueen, and Herman—were "exercising [discretion] in the administration of a department or agency of government including, but not limited to examples such as: hiring, firing, transferring, assigning, or supervising personnel."  (Def.'s Br. in Support, at 19, Doc. #116.)

Wilson, however, responds that the individual City Defendants are not entitled to immunity because they acted outside their authority in (1) disregarding the original EAP findings—specifically, Holmberg's recommendation issued on January 9, 2006, that Doss be assigned to a desk job for two to three months and Dr. Abolade's recommendation that Doss be transferred to a different assignment, if possible; (2) pressuring Holmberg to change her recommendation that Doss was fit for normal duty; and (3) pressuring Carnell to write a memorandum stating that he concurred with the recommendations of the EAP providers that Doss be returned to full duty.  Wilson further argues that, even if the officers were acting within the scope of their duties as police officers, they were not performing a discretionary function because (1) of the four officers, Baylor was the only person with the authority to send Doss back to work after EAP counseling; and (2) none of the officers had the discretion to disregard the EAP procedure, as Wilson alleges they did.

       i.     <u>The Individual City Defendants Were Performing Discretionary Functions Entitled to State-Agent Immunity</u>.

The Court finds that the conduct of the individual City Defendants falls clearly within the second category of the *Cranman* test because they were exercising their judgment in making decisions regarding the EAP process and Doss's job assignment within the MPD and interpreting the evaluations of the EAP providers.

It is undisputed that Baylor, as the highest officer in the chain of command, was the only person with the authority or discretion to send Doss back to his assignment at Capitol Heights Junior High School upon the conclusion of the EAP process or, alternatively, to transfer Doss to a different assignment within MPD involuntarily.  (Def.'s Br. in Support, at 19, Doc. #116; *see also* MPD Rules § 1.602, Doc. #123-2.)  Thus, the Court concludes that Baylor was performing a discretionary function when deciding whether to return Doss to full duty or transfer him to another assignment.

In addition, the record also reveals that the MPD's EAP process similarly required the other City Defendants to use their discretion and judgment.  The EAP process allowed for the Juvenile Division Commanders—Reid and McQueen—to use their judgment in interpreting the fit-for-duty-evaluations of Holmberg and Dr. Abolade, the two EAP providers.  According to the MPD Rules and Regulations, "[i]nvoluntary transfers may be identified and determined necessary by Division Commanders . . . ."  (MPD Rules § 1.602.)  Furthermore, Herman, as Doss's direct supervisor, was tasked with overseeing the EAP referral process and communicating with the EAP providers.  (Herman Dep., 108:20–109:10, Doc. #115-7.)   In this supervisory role, he had to use some level of discretion in communicating with Holmberg or Doss regarding the EAP process and results.  Finally, it

is evident from Carnell's deposition testimony that Carnell had the authority, as the risk manager for the City, to "advise the supervisor employees of the City on risk management based issues," including personnel decisions.  (Carnell Dep. 41:21–42:5, Doc. #115-16.)

Notwithstanding this evidence, Wilson argues that the four officers lose the cloak of immunity because, pursuant to an unwritten policy, "Baylor, McQueen, and Carnell [had] no authority or discretion to change or disregard an EAP recommendation related to fitness for duty or work assignment," and thus, their actions fall outside the definition of a "discretionary function."  (Pl.'s Br. in Opposition, at 21, Doc. #119.)

The Court disagrees with Wilson's characterization of the EAP process and policy. In the Court's view, there was an unwritten policy that the EAP providers' fit-for-duty evaluations would be relied upon in determining whether an officer was fit to return to duty. It is clear from Carnell's testimony that no officer had the authority to simply ignore the EAP recommendations.  During his deposition, Carnell agreed with Wilson's counsel that officers "don't have the ability just to blatantly disagree with what the EAP is doing[.]" (Carnell Dep. 51:3–52:4, 8– 11, Doc. #115-16.)  Baylor further testified that he would not approve an officer's return to full duty until that officer was "cleared" by EAP, stating, "[i]t might be a week or a month, or two months, but [the officer] would end up being cleared before I would approve them – before I would approve them to go back to work." (Baylor Dep. 116:12–17, Doc. #115-13.)  The Court, however, has found no evidence that the EAP process required that the officers exercise absolutely no judgment whatsoever in interpreting the recommendations of the EAP providers when passing those recommendations up the

chain of command to Baylor.

Moreover, the Court has found no evidence in the record that any of the individual City Defendants either changed or ignored the recommendations of the EAP providers. Construing the facts in the light most favorable to Wilson, the Court finds that there is no dispute that the City Defendants did not expressly direct Holmberg to change her initial recommendation on January 9, 2012, that Doss be placed on light duty for two to three months. Instead, the evidence shows that after receiving Holmberg's first recommendation, McQueen instructed Herman to call Holmberg and advise her that: (1) they did not have any desk jobs available for Doss at that time; and (2) the supervisors would like Holmberg to refer Doss to a psychiatrist. (Herman Dep., 108:20–109:10, Doc. #115-7.) Herman did just that, and went on to inform Holmberg that Doss would likely be placed on administrative leave with pay until his leave expired, at which time he would be placed on administrative leave without pay.[5] (Herman Dep., 106:18–108:23, Doc. #115-7.) While Holmberg testified that she felt pressured by Herman, McQueen, and Reid to get Doss back to work, (Holmberg Dep. 57:10–18 – 59:16–22, Doc. #115-20), her subjective feelings are not evidence that the individual City Defendants pressured, forced, or even asked her to change her January 9, 2012 recommendation to manipulate or somehow circumvent the EAP process.

There is also no evidence to support Wilson's contention that the individual City Defendants disregarded the EAP recommendations. Dr. Abolade's January 12, 2006

---

[5] According to Holmberg, it was common for her to communicate directly with supervisors during the EAP process. (Holmberg Dep. 51:9–19, Doc. #115-20.)

memorandum stated: "In my opinion [Doss] is fit to return to normal duty and I recommend a different assignment, if possible, than the one in which he is currently employed." (Abolade Memo., Doc. #120-3.)  In addition, Holmberg's January 12, 2006 memorandum stated: "It is my recommendation at this time that Corporal Doss be placed on normal duty." (Holmberg Memo. dated Jan. 12, 2012, Doc. #115-22, at 11.)  Both memoranda clearly state that Doss was fit for normal duty, and they make no mention of transferring Doss to another position or assignment to avoid contact with children.[6]  Although Dr. Banach—who was Doss's personal family physician and not a mental health professional—recommended on January 9, 2012, that Doss be reassigned to a job where he would not have contact with juveniles (Def.'s Ex. A, Doc. #123-4), there is no dispute that it was within the individual City Defendants' discretion to rely on the recommendations of Holmberg and Dr. Abolade, as the EAP providers in Doss's case, as opposed to Doss's personal physician.

> ii.   The Conduct of the Individual City Defendants Does Not Fall Within Any Exception to State-Agent Immunity.

Having found that the individual City Defendants were performing discretionary functions entitling them to state-agent immunity, the Court further concludes that Wilson has not shown that the individual City Defendants violated a department rule, statute, or the

---

[6] Wilson makes much of the fact that Dr. Abolade recommended a different assignment for Doss, if such a transfer was possible.  Even reading Dr. Abolade's memorandum in the light most favorable to Wilson, the Court does not interpret this recommendation as a mandatory directive to remove Doss from the schools.  It is undisputed that the EAP providers did not have the authority to make personnel transfer decisions.  At best, Dr. Abolade's transfer recommendation is a suggestion.  It was not, as Wilson suggests, a limitation on Doss's ability to perform his current job. (Carnell Aff., Doc. #123-1.)

Alabama Constitution, or that they acted beyond their authority, willfully, maliciously, fraudulently, or in bad faith.  Thus, Wilson has not met his burden of proving that the individual City Defendants fall within any of the exceptions to state-agent immunity in the *Cranman* test.  *See Cranman*, 792 So. 2d at 405.

First, as discussed above, there was no rule prohibiting the individual City Defendants from exercising their judgment and discretion in the EAP process.  There is also no evidence that any of the City Defendants violated the understood, albeit unwritten, policy that the EAP providers' fit-for-duty evaluations could not be changed or disregarded by any officer.

Second, there is no evidence that any of the individual City Defendants acted beyond their authority.  To prove that the City Defendants' actions fall within this exception, Wilson would have to show that the individual City Defendants "fail[ed] to discharge [their] duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Id.*  Wilson has pointed to no detailed rule or regulation that the City Defendants violated.  *See Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003); *Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002).  It is undisputed that the EAP procedure was not written in any manual, but rather it was a generally understood policy that the EAP fitness for duty recommendations would be followed.[7]  The Court concludes that this is not the type of detailed rule or regulations

---

[7] Even assuming that the City Defendants wrongfully failed to remove Doss from Capitol Heights Junior High School while he received EAP counseling, no harm was proximately caused by that decision because there was no injury to Wilson or any other person between the time he started counseling and his eventual release from counseling.  In fact, no abuse occurred until December 2006—nine months after Holmberg  released Doss from further EAP counseling due to his overall progress and improved coping skills.  (*See* Holmberg Memo. dated March 21, 2006, Doc. #115-22, at 8; Holmberg Memo. dated March 7, 2006, Doc. #115-22, at 7.)  Accordingly, there is

contemplated by the second *Cranman* exception.  *See Giambrone*, 874 So. 2d at 1054 (finding that coach of high school wrestling team, who caused severe injury to a freshman student with whom he engaged in a "full speed" wrestling match, was not entitled to state-agent immunity because the coach violated sufficiently detailed national wrestling guidelines and state athletic association's code of conduct).  Moreover, as discussed above, the Court has found that none of the individual City Defendants violated the EAP general policy.

Finally, there is no evidence that any of the individual City Defendants acted maliciously, wilfully, fraudulently, or in bad faith.  Wilson points to the alleged pressure and coercion upon Holmberg and Carnell in support of his assertion that the individual City Defendants acted corruptly in returning Doss to full duty.

As discussed above, there is no substantial evidence that the individual City Defendants pressured, forced, or coerced Holmberg to change her recommendation. Holmberg's subjective feelings are simply not enough in the absence of record evidence. There is also no evidence that Reid, McQueen, or Baylor pressured or coerced Carnell into falsifying a memorandum to Baylor and Reid regarding Doss's fitness for duty.  (Carnell Memo., Doc. #120-5.)  Although Carnell testified in his deposition that he expressed his opinion to McQueen that Doss ought to be transferred to a different assignment if he was returned to full duty, he nevertheless wrote a memorandum in which he concurred with

---

nothing in the record to support an inference that Doss's sexual abuse of Wilson was caused by the City Defendants' decision not to remove Doss from duty during the period of his treatment, since on March 21, 2006, he was found to be capable of normal duty without any need for further treatment.

Holmberg and Dr. Abolade's recommendations that Doss be returned to full duty. (Carnell Dep. 172:10–173:5, Doc. #115-17.) In his memorandum, Carnell failed to mention Dr. Abolade's suggestion that he be transferred to a different assignment if possible. (Carnell Memo., Doc. #120-5.) The very most that Carnell's deposition testimony demonstrates is that McQueen told Carnell that Baylor wanted his recommendation regarding Doss in writing. (Carnell Dep. 178:8–10.) The Court finds that this request is not enough to support Wilson's characterization of Doss's EAP evaluation process as a "picture of fraud, corruption, coercion, and cover up [sic]." (Pl.'s Br. in Opposition, at 21, Doc. #119.)

Accordingly, because the Court has concluded that the individual City Defendants are entitled to state-agent immunity, the City Defendants' Motion for Summary Judgment as to Wilson's state law claims of negligence and wantonness against Baylor, Reid, McQueen, Carnell, and Herman is due to be GRANTED.

### 3. *Municipal Liability of the City of Montgomery Pursuant to Alabama Code § 11-47-90*[8]

---

[8] It is unclear whether Wilson intended to assert the negligence, wantonness, and/or willfulness claims in Count II of his Amended Complaint directly against the City in addition to Doss and the individual City Defendants. (*Compare* Amend. Compl. Count II, ¶ 25, Doc. #46 (appearing to assert such claims against the City), *with* Amend. Compl. Count II, Prayer for Relief, Doc. #46 (demanding judgment for such claims against only Doss and the individual City Defendants)). For purposes of this Motion, the Court finds that Wilson did not intend to assert such a claim against the City. In any event, even if Wilson had intended to assert such a claim against the City, Alabama law limits the liability of a municipality to negligence and does not permit recovery against a municipality for wantonness and willfulness. *See Town of Loxley v. Coleman*, 720 So. 2d 907, 909 (Ala. 1998) (recognizing that § 11-47-190 limits the liability of a municipality to negligence, specifically excluding liability for "wanton misconduct").

Wilson appears to claim that the City of Montgomery should be held liable for its own negligent, unskillful, or careless conduct in allowing Doss and the individual City Defendants to work with minor children in the schools.  (Amend. Compl. ¶ 33, Doc. #46.)  Wilson goes on to allege that the City and its agents negligently, unskillfully, or carelessly failed to remove Doss from the schools.  (*Id.* at ¶¶ 33–34.)  The Court finds that Wilson's claims against the City are precluded by this Court's conclusion that the City employees are entitled to state-agent immunity.

Alabama has only partially abrogated municipal immunity, so a municipality can in fact incur liability for the negligent (but not the intentional or wanton) acts of its employees. *See* Ala. Code § 11-47-190 (1975); *Coleman*, 720 So. 2d at 909.  In other words, the common law rule of vicarious liability applies to Alabama's municipalities.  *See Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314 (S.D. Ala. 2001).  This means that, "for the employer to be liable under th[e] doctrine, the employee must first be liable for a tort," and "[i]f the agent is not liable for any tort, the principal is also absolved." *Id.* (citing *Latham v. Redding*, 628 So. 2d 490, 495 (Ala. 1993)).

Because the individual City Defendants are entitled to state-agent immunity under the *Cranman* test, the Court concludes that the City cannot be held vicariously liable for the individual City Defendants' conduct under § 11-47-90.  Nor can the City be held liable for Doss's intentional torts against Wilson because § 11-47-90 only abrogates municipal immunity for negligent, careless, or unskillful conduct of municipal employees, not their intentional conduct.

To the extent that Wilson seeks to hold the City directly liable for negligently or carelessly hiring, training, managing, and supervising its employees, the Court concludes that this cause of action is not supported by the language of § 11-47-90.  That statute states, in relevant part:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty . . . .

*Id.*  Thus, a negligent, careless, or unskillful act by an employee is required to hold the City responsible in this case.  Because the Court has found that the employees of the City are cloaked in state-agent immunity, the City is also absolved from liability under § 11-47-90.  Accordingly, the Court concludes that the City Defendants' Motion for Summary Judgment as to Wilson's claim of municipal liability under Alabama Code § 11-47-90 is due to be GRANTED.

## B.   <u>Federal Constitutional Claims Brought Under 42 U.S.C. § 1983 Against the City Defendants</u>

Wilson brings claims against the City Defendants pursuant to § 1983 for deprivations of Plaintiff's "constitutional rights and privileges to be free from sexual assault, bodily integrity, abuse and molestation under color of state law."  (Amend. Compl. at ¶ 38, Doc. #46.)

In support of its motion for summary judgment, the City Defendants counter that "Plaintiff has not identified a right under the [C]onstitution that has been violated."  (Doc. #116, at 22.)

This Court finds that a fair reading of Wilson's Amended Complaint leads to the inevitable conclusion that he has identified and alleged a deprivation of a constitutional right, as multiple circuits and the Alabama Supreme Court have recognized that an individual has a federal constitutional right to be free from sexual abuse by state actors under the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *C.B. v. Bobo*, 659 So. 2d 98, 104 (Ala. 1995) (holding that the right to be free from sexual abuse and molestation at the hands of school officials is a constitutional right under the Due Process Clause of the Fourteenth Amendment, the deprivation of which can be the basis of an action under § 1983); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) (holding that the Due Process Clause protects the liberty interest of a child in public school from sexual abuse or sexual harassment by state actors); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994) ("It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.").

Individuals seeking redress in the courts for such violations of their constitutional rights may not sue directly under the United States Constitution.  Rather, they must make a claim through 42 U.S.C. § 1983.  Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

42 U.S.C. § 1983.

Because of the differing legal standards governing their disposition, the claims against the City and the claims against the City Defendants are analyzed in separate sections below.

### 1.    *Section 1983 Individual Capacity Claims Against the Individual City Defendants*[9]

In support of their motion for summary judgment, the individual City Defendants invoke the doctrine of qualified immunity in an attempt to shield them from Wilson's individual capacity claims.  Specifically, the individual City Defendants argue that they are due summary judgment because they did not have the requisite knowledge, either actual or constructive, of Doss's propensity to sexually abuse minors.  (Doc. #123, at 13.)  Wilson responds that the individual City Defendants have not met their burden with respect to qualified immunity because they have failed to establish that they were exercising a discretionary function of their respective jobs.  (Doc. #46, at 9.)

---

[9]  At this stage in the proceedings, Wilson has evidently abandoned the distinction between his "supervisory liability" claims against Baylor, Herman, Reid, Carnell, and McQueen (Amend. Compl. at ¶¶ 41–43, Doc. #46) and his "individual direct liability" claims against Baylor, Herman, Reid, Carnell, and McQueen (Amend. Comp. at ¶¶ 44–47).  Given the lack of a doctrinal distinction between the sets of claims as so characterized, the Court will now address and dispose of all federal claims against the individual City Defendants here.

The Court finds that Wilson is mistaken with respect to his contention that the individual City Defendants have not cited to any evidence to meet their burden on qualified immunity. The City Defendants have cited to adequate record evidence that the challenged actions by the individual City Defendants were taken while they were performing discretionary job functions. Notwithstanding the foregoing, the Court will also consider the arguments raised in Section I of Wilson's response to fairly and conclusively dispose of the summary judgment issues before it.

### a. Qualified Immunity—Applicable Law

Qualified immunity protects government officials from the chilling effect that the fear of personal liability would create in carrying out their discretionary duties. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To this end, it immunizes "from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages" as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In asserting a claim of qualified immunity, a defendant must first show that "the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1281 (11th Cir. 1998). If the official meets this initial burden, the plaintiff must then show that the official's conduct violated clearly established law." *Id.*  In determining whether the plaintiff has met this burden, the court may first determine whether the plaintiff has alleged the deprivation of a constitutional right, and then may determine whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 197 (2001).[10]  In the Eleventh Circuit, a law can be clearly established by decisions of the United States Supreme Court, the Eleventh Circuit itself, and the highest court in the state where the claim arose. *Courson v. McMillian*, 939 F.2d 1479, 1497–98 & n.32 (11th Cir. 1991).

However, the Eleventh Circuit does "not expect public officials to sort out the law of every jurisdiction in the country." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc); *but see Tekle v. United States*, 457 F.3d 1088, 1096 (9th Cir. 2006) ("In the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts."); *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("[W]e broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair

---

[10] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court retreated from *Saucier*'s holding that courts must apply the first step before applying the second step in making a qualified immunity determination.

assurance that the recognition of the right by a controlling precedent was merely a question of time."); *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) ("[F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

Because qualified immunity acts as an affirmative defense, the "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* Instead of asking "whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). To determine whether an official was engaged in a discretionary function, "we ask whether the government employee was (a) performing a legitimate, job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* Accordingly, the inquiry does not ask "whether the act complained of was done for an improper purpose, but 'whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Plotkin v. United States*, 465 F. App'x 828, 831–32 (11th Cir. 2012) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

Once officers seeking qualified immunity show that they acted in a discretionary capacity, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lee*, 284 F.3d at 1194. If officers meet their burden, a plaintiff must show that they violated

clearly established law and that the law was clearly established when the challenged conduct occurred. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). In sum, the plaintiff bears the burden of showing that, when the officers acted, "the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.").

In *C.B. v. Bobo*, the Alabama Supreme Court held that the right to be free from sexual abuse and molestation at the hands of school officials is a constitutional right under the Due Process Clause of the Fourteenth Amendment, the deprivation of which can be the basis of an action under § 1983. 659 So. 2d at 104. In the same decision, the Alabama Supreme Court articulated the following test for determining whether qualified immunity should apply in such cases: "in order to determine the personal liability of the defendants for [the school official's] sexual abuse of the student plaintiffs, the student plaintiffs must establish that the defendants, by action or inaction, demonstrated *deliberate indifference* toward the student plaintiffs' constitutional rights and *thereby proximately caused* the violation of those rights." *Id.* (emphasis added).

In sum, *Bobo* recognized a clearly established right of school children to be free from sexual abuse at the hands of school officials, and further establishes that school officials can be held liable for acts that constitute *deliberate indifference* to that right. *See id.* (emphasis added).

**b.    Qualified Immunity—Application**

i.   <u>The Individual City Defendants Were Engaging in Discretionary Functions Entitled to Qualified Immunity</u>.

The record makes clear that each of the individual City Defendants were acting within their job responsibilities at all times relevant to the challenged EAP process that led to Baylor's final decision to return Doss to full duty.  Reid and McQueen, as Juvenile Division Commanders, were expressly authorized by the MPD Rules and Regulations to "identif[y] and determine[] necessary" involuntary transfers, which authorized them to suggest referring Doss to the EAP as well as interpret and communicate the recommendations of the EAP process.  (*See* MPD Rules § 1.602, Doc. #123-2.)  Discretion was similarly required of Herman as Doss's immediate supervisor, given that he was tasked with communicating the needs and concerns of his supervisors to Holmberg.  (Herman Dep. 108:20–109:1, Doc. #115-7.)  It is also clear that Carnell had the authority, as the City's risk manager, to "advise the supervisor employees of the City on risk management based issues," which naturally includes advising on personnel issues.  (Carnell Dep. 41:21–42:5, Doc. #115-16.)  Since Reid, McQueen, Herman, and Carnell were acting within their job responsibilities at all times relevant to the challenged EAP process, they have met their burden with respect to qualified immunity.

As Chief of Police, Baylor was exercising his job responsibilities when reinstating Doss in his position upon receiving the overall fit-for-duty recommendation from the EAP process.  It is undisputed that Baylor had the sole authority and discretion to make reinstatement and transfer orders on the conclusion of the EAP process.  (Def.'s Br. in

Support, at 19, Doc. #116; *see also* MPD Rules § 1.602, Doc. #123-2.)  As such, Baylor was acting within his job responsibilities when deciding whether to return Doss to full duty. Therefore, Baylor has met his burden with respect to qualified immunity.

Based on the foregoing, the Court finds that Herman, Reid, McQueen, and Carnell were acting within their job responsibilities—and therefore engaging in discretionary functions—while requesting, receiving, construing, summarizing, and communicating the results of the EAP process to Baylor.  *See Harland*, 370 F.3d at 1265 (holding that qualified immunity protects defendants as they are "(a) performing a legitimate, job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize").

ii.   Wilson Fails to Demonstrate that the Individual City Defendants
Violated Clearly Established Law.

Since the individual City Defendants have met their burden with respect to qualified immunity, to survive summary judgment, Wilson must now be able to show (1) that they violated clearly established law, and (2) that the law was clearly established when the challenged conduct occurred.  *See Al-Kidd*, 131 S. Ct. at 2080.  Wilson fails conclusively on the first prong of this test, making analysis of the second prong unnecessary.

It is undisputed that the individual City Defendants had no knowledge of the risk that Doss might deprive children of their right to be free from sexual abuse at the hands of state agents, the very right of which Wilson was ultimately deprived.  (Herman Dep. 51:13–52:19, Doc. #115-6; McQueen Dep. 102:22–103:11, Doc. #115-27; Reid Dep. 68:4–68:19, Doc.

#115-10; Baylor Dep. 161:13–163:8, Doc. #115-12.)  Holmberg also testified that Doss never disclosed to her that he had any tendencies or desires to sexually abuse children. (Holmberg Dep. 63:20–64:3, Doc. #115-20.)  Even Doss himself claims that, at the time he broke down and told his superiors about physically hurting the schoolchildren, he was only depressed and aggravated and had "no sexual feelings" towards children.  (Doss Dep. 75:17–76:13, Doc. #115-2.)

Without any evidence demonstrating that the individual City Defendants' had knowledge of Doss's propensities to sexually abuse children, there can be no genuine dispute as to whether the City Defendants acted with deliberate indifference to the risk of depriving Wilson of his constitutional right to be free from sexual abuse.  *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (holding that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious* consequence of his action") (emphasis added)).  Given that the individual City Defendants' lacked any actual or constructive knowledge of Doss's ultimate sexual tendencies towards children, the City Defendants could not have foreseen that Wilson's abuse would be a "known or obvious" consequence of their actions in reinstating Doss.  *See id.*  Therefore, the individual City Defendants are entitled to qualified immunity.  Accordingly, the City Defendants' Motion for Summary Judgment with respect to Wilson's § 1983 claims against the individual City Defendants is due to be GRANTED.

   **2.** ***Section 1983 Claim Against the City of Montgomery***

     **a.** **Municipal Liability under § 1983—Applicable Law**

In *Monell v. New York City Department of Social Services,* the United States Supreme Court decided that a municipality can be held liable for deprivations of constitutional rights under § 1983.  486 U.S. 658 (1978).  However, in so doing, the Supreme Court placed limitations on the circumstances in which such liability may be imposed.

Under § 1983, there is no *respondeat superior* liability; a municipality may not be sued under § 1983 for the acts of others.  *See Monell,* 436 U.S. at 691–94; *see also Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.), *cert. denied*, 525 U.S. 870 (1998) (municipality may not be liable for the wrongful actions of its police officers pursuant to a *respondeat superior* theory of liability).  Instead, "municipal liability is limited to action for which the municipality is actually responsible."  *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986)).

Thus, to prevail on a § 1983 claim against a municipality, a plaintiff must satisfy the following two-prong test for municipal liability.  A plaintiff must (1) "identify conduct attributable to the municipality," and (2) "show that it 'was taken with the requisite degree of culpability, *i.e.*, that the municipal action was taken with deliberate indifference to its known or obvious consequences.'"  *Doe v. City of Demopolis*, 799 F. Supp. 2d 1300, 1313 (S.D. Ala. 2011) (quoting *Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1263).

Regarding the test's first prong, conduct is attributable to a municipality only if it "result[s] from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it

37

assumes the force of law." *Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1263 (quoting *Denno v. School Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000)). Regarding the test's second prong, the United States Supreme Court has held that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

In cases involving sexual abuse of a minor child, this Court recognizes that while a municipality ordinarily may assume that its employees need no training, supervision, or screening to prevent them from sexually abusing students, "a municipality's right to rely on the common sense of its police officers to refrain from perpetrating sex crimes on young [people] is not unbounded, and that such reliance must give way where the municipality has 'notice to the contrary.'" *Doe*, 799 F. Supp. 2d at 1315 (S.D. Ala. 2011) (quoting *Floyd v. Waters*, 133 F.3d 786, 796 (11th Cir. 1998), *vacated on other grounds*, 525 U.S. 802 (1998)). Thus, for "deliberate indifference" to be found in a sexual abuse case involving a municipal employee, it must be shown that the municipality received "notice" that one of its officers was highly likely to sexually abuse students and still did nothing to protect them.

### b.    Municipal Liability—Application

Wilson alleges that the execution of the City's "custom or policy" of "not properly monitoring, supervising, transferring, counseling, or assessing its employees that could be dangerous to minor children" caused the deprivation of Wilson's constitutional right to be free of sexual abuse by state agents.  (Doc. #46, ¶¶ 38–40.)

In response, the City contends that Wilson "failed to identify a policy or custom," (Doc. #116, at 23),  and that because it had "absolutely no evidence that [the City] had knowledge" that "Doss would have inappropriate sexual contact with minors," it cannot be held liable for failing to prevent the deprivation of Wilson's constitutional right to be free from sexual abuse by state agents.  (Doc. #123, at 13.)

      i.     <u>Wilson Fails to Satisfy the First Prong of the Two-Part Test for § 1983 Municipal Liability</u>.

Wilson has failed to identify conduct attributable to the City.  *See Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1263 (identifying the three types of conduct attributable to a municipality for purposes of § 1983 liability).  While Wilson pled that the City had a "custom or policy" of "not properly monitoring, supervising, transferring, counseling, or assessing its employees that could be dangerous to minor children," (Doc. #46, ¶¶ 38–40), he does not direct the Court to any evidence in support of that proposition. (Doc. #119, at 30–34.)  Wilson also fails to identify "an official fairly deemed to represent government policy" whose actions might be attributed to the municipality, such as Baylor.  *See Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1263.

Wilson's bare allegation of a "custom or policy," without more, does not raise a genuine issue of material fact to preclude the entry of summary judgment.  *See* Fed. R. Civ. P. 56(c).  Therefore, Wilson has failed to raise a fact issue with respect to the first prong of the two-part test for § 1983 municipal liability.  On that basis alone, the City's Motion for Summary Judgment with respect to § 1983 municipal liability is due to be GRANTED.

      ii.    <u>Even if Wilson Could Satisfy the First Prong, There is Insufficient</u>
<u>Evidence to Support a Finding of Deliberate Indifference on the Part of</u>
<u>the City</u>.

The record contains no evidence that the City's final policymakers had notice that Doss had any desire to sexually abuse juveniles, or that the City's final policymakers were deliberately indifferent to other information that should have put them on notice that Doss had these desires.  (Baylor Dep. 161:13–163:8.)  In fact, Wilson did not even allege who at the MPD was a final policymaker for purposes of his § 1983 claim against the City.  Without it being known or obvious to the City that reinstating Doss in his position would lead to his sexually abusing students, the City cannot be found to have been deliberately indifferent, as is required for imposing § 1983 liability.  *See Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1263.  For this additional reason, summary judgment is due the City on Wilson's § 1983 claim.

## VI. CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (Doc. #115) filed by the City of Montgomery, Art Baylor, Terry Reid, Jerry McQueen, William E. Herman, and John Carnell is due to be and hereby is GRANTED in its entirety, and Plaintiff Judson Wilson's claims against these Defendants are hereby DISMISSED with prejudice.  Plaintiff Judson Wilson's claims against Defendant Billy Gene Doss remain pending.  Jury selection in this matter is scheduled to begin on December 10, 2012, with trial starting on December 17, 2012.  The remaining parties are further DIRECTED to file an amended pretrial order taking into account the rulings made in this order no later than November 30, 2012.

DONE this the 21st day of November, 2012.


_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE

41